UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RONALD KUFNER, M.D.,

               Plaintiff,                                 Case No. 1:06-cv-910

v.                                                     HON. JANET T. NEFF

JEFFERSON PILOT
FINANCIAL INSURANCE COMPANY,

               Defendant.

_____/


**OPINION**

      Plaintiff Ronald Kufner, M.D., appeals the denial of his claim for long-term disability (LTD)

benefits by defendant Jefferson Pilot Financial Insurance Company under a policy issued to his

employer, Anesthesia Medical Consultants, P.C. (AMC).  The policy establishes an employee

welfare benefit plan subject to the Employment Retirement Income Security Act of 1974 (ERISA),

29 U.S.C. § 1001 *et seq*.  Defendant serves as the plan administrator and determines eligibility for

benefits.  The Court has carefully considered the parties' briefs and their oral argument.  For the

reasons that follow, the Court concludes that defendant wrongfully denied plaintiff's claim for LTD

benefits.

**I.  Nature of the Appeal**

      Plaintiff, an anesthesiologist, sought LTD benefits under a plan issued to AMC by defendant

following a period of time off work in 2004 due to opioid and alcohol dependence.  Although

defendant initially granted plaintiff LTD benefits, it subsequently denied plaintiff's claim because

plaintiff had returned to work.

Plaintiff contends that despite his return to work, he was nevertheless entitled to disability benefits under the plan because he was unable to work *full-time*, which is essentially defined under the plan as full-time performance of all main duties of his occupation based on the average number of hours he was regularly scheduled to work.  Plaintiff contends that he met this definition because the normal full-time hours of an anesthesiologist are 70-80 hours per week, but plaintiff had a medical restriction limiting him to working no more than 40-50 hours a week.  Further, he was unable to perform all the main duties of his occupation since he was subject to a restriction on handling narcotics.  Defendant's position is that the medical evidence demonstrates that plaintiff's condition is not of the severity to render him incapable of performing the main duties of his regular occupation.

## II.  Summary of Analysis

On initial review, this ERISA appeal would appear to present a benefits determination based merely on a choice between contrary medical opinions offered by the parties.  In such cases, the Supreme Court has held that a plan administrator need not "automatically [] accord special weight to the opinions of a claimant's physician."  *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834 (2003).  On closer review, however, the Court finds that the parties' opposing evidence does not warrant equal weight.  Plaintiff provided medical records and diagnoses of his treating physicians to establish his eligibility for LTD benefits; the evidence relied on by defendant consisted of simply "peer review" reports based on plaintiff's files.  This disparity in the evidence is a factor that may be considered on judicial review of a benefits determination.  *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 295 (6th Cir. 2005); *see also Glenn v. MetLife,* 461 F.3d 660, 671 (6th Cir. 2006), *aff'd, Metropolitan Life Ins. Co. v Glenn,* ___ U. S. ___; 128 S. Ct. 2343 (2008).

2

The Court has considered the extensive evidence presented by plaintiff supporting his LTD claim, the disparity in the evidence, and the additional factors of (1) defendant's conflict of interest in benefit determinations, *Glenn,* ___ U. S. ___, 128 S. Ct. at 2350, and (2) considerations of public health and safety specific to this case, *see id.* at 2351. Even giving due regard to the deferential standard of review, the Court concludes that defendant abused its discretion in denying LTD benefits to plaintiff under the plan provisions.

### III.  Standard of Review

Under the guidelines set forth in *Wilkins v. Baptist Health Care Sys., Inc.,* 150 F.3d 609, 618-19 (6th Cir. 1998), ERISA actions are not subject to the procedures for summary judgment or bench trials, including discovery. Instead, judicial review must be based solely on the administrative record.[1] *Id.*

The parties agree that defendant's denial of benefits is subject to the arbitrary and capricious review standard set forth in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101 (1989), because the benefit plan gives defendant the discretion to both interpret the terms of the benefit plan and determine a claimant's entitlement to benefits. An outcome is not arbitrary and capricious when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome. *Evans v. UnumProvident Corp.,* 434 F.3d 866, 876 (6th Cir. 2006). A decision will be upheld if it results from a "deliberate principled reasoning process," and is supported by substantial evidence. *Id.* (citations omitted).

---

[1] The only exception is when new evidence is necessary to resolve a claimant's procedural challenge to the administrator's decision, such as an alleged lack of due process or an allegation of bias.

The arbitrary and capricious standard is a highly deferential standard. *Id.* at 875.  However, the Supreme Court recently elucidated the consideration necessary in cases in which the plan administrator performs the dual roles of benefit eligibility determination and payment of benefits, which presents a conflict of interest. *Glenn,* ___ U. S. ___, 128 S. Ct. at 2348.  In such cases, the court must apply a deferential standard of review to the administrator's decision, but the conflict of interest should be weighed as a factor in reviewing a discretionary benefit determination. *Id.* at 2350.  The conflict should be considered along with other, often case-specific factors. *Id.* at 2351. "[A]ny one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Id.*

## IV.  Background and Facts

Plaintiff Ronald Kufner, is a physician employed as an operating room anesthesiologist for Anesthesia Medical Consultants (AMC), P.C (Administrative Record ("AR") 636).  Plaintiff was a participant in AMC's Long-Term Disability Plan (the "Plan"), an employee welfare benefit plan governed by ERISA.  The Plan provides a Monthly Benefit in the event a participant suffers "Total Disability" or "Partial Disability," as defined by the Plan (Policy 21-22).

On June 1, 2004, plaintiff stopped working due to drug and alcohol dependence (AR 112). He was diagnosed with opioid dependence, benzazopine abuse, depression, and gastroesophageal reflux disease, chronic low back pain and a history of alcohol dependence (AR 583).  He was admitted to Spectrum Health, Kent Community Campus, for detoxification and treatment (AR 583, 591-92).  Plaintiff was hospitalized from May 31, 2004 to June 7, 2004 (*id.*).

Following his release from Spectrum Health on June 7, 2004, plaintiff entered a residential treatment program with West Michigan Addiction Consultants (WeMAC), PC (AR 510-11, 591-92). As part of the WeMAC Professional Recovery System (PRS), plaintiff entered into a two-year Continuing Care Contract, an Intervention Contract, and Relapse Contract prior to his discharge on October 1, 2004 (AR 503-09, 511).

In June 2004, plaintiff filed a claim for Short Term Disability (AR 636, 639-40). In support of his claim, plaintiff submitted medical records, and statements and opinions of his physicians, including his primary treating physician at WeMAC, Dr. Thomas Haynes, who specializes in addiction medicine (AR 640-41). Dr. Haynes' statement on the claim form indicated that detoxification was required from May 31, 2004 to June 7, 2004, followed by intensive outpatient treatment and that plaintiff could not work while in the PRS program (AR 640). In a letter dated July 28, 2004, defendant approved plaintiff's claim for Short Term Disability (AR 608), which was limited to thirteen weeks, and would thus end on September 7, 2004 (*id.*). The letter stated that plaintiff's claim was referred to a Long Term Disability specialist for consideration of benefits beyond September 7, 2004 (*id.*).

During August 2004, defendant conducted its investigation of plaintiff's claim for LTD benefits (AR 605). Plaintiff was required to submit medical records for defendant's determination of any preexisting conditions as well as additional medical records, including updated medical records from Dr. Haynes (AR 605-07). In a letter dated September 7, 2004, defendant notified plaintiff that his claim for LTD benefits was granted subject to a 90-day elimination period under the policy (AR 520). The letter stated that after satisfaction of the 90-day period, plaintiff's benefits would begin on August 30, 2004 (*id.*).

On October 14, 2004, plaintiff returned to work under restrictions imposed by Dr. Haynes, including a maximum 40-hour week and no on-call duty, and he could not dispense narcotics (AR 21, 511).  In April 2005, his approved work hours were increased to 40-50 hours a week (AR 21). In a letter to plaintiff dated November 10, 2004, defendant stated that it was aware that plaintiff had returned to work part-time and that his claim had been reviewed for partial disability benefits, which defendant had approved (AR 494).  Defendant stated further that medical records would be requested on a monthly basis (AR 496).  Defendant set forth the Plan provisions for partial disability during the 90-day elimination period and the two-year Own Occupation period (AR 494-96).

In a March 4, 2005 letter to plaintiff, defendant stated that it had requested medical records from Dr. Haynes to determine plaintiff's continued eligibility for benefits (AR 462).  Defendant sent a similar letter on June 20, 2005 (AR 432).  In a letter dated July 11, 2005, defendant notified plaintiff that it had completed its review of plaintiff's LTD claim, and his request was denied (AR 416).  Defendant stated that it had reviewed plaintiff's records and the most recent therapy notes, which indicated that Dr. Haynes granted plaintiff's request to increase his work hours and plaintiff had not experienced any triggers or relapses (AR 417).  Further, plaintiff had reached one year of sobriety on June 1, 2005.  The letter stated that after reviewing all the therapy records from Dr. Haynes, most recently dated June 22, 2005:

> it appears you have demonstrated the ability to manage your stress and have successfully completed your inpatient treatment for your opioid dependency.  Dr. Haynes feels you are capable of increasing your work hours and you continue with your now monthly therapy sessions.  The records we have received no longer show a condition which would prevent you from performing the main duties of your own occupation therefore we have denied further benefits beyond 6/22/2005.

(AR 417).

6

On December 28, 2005, plaintiff appealed defendant's denial of benefits pursuant to his right of appeal under ERISA (AR 339-345).  Plaintiff's counsel contended that plaintiff was entitled to partial disability benefits under the Plan terms (AR 345).  In support of the appeal, plaintiff included:

> (1) a letter dated July 22, 2005 from Dr. Haynes;

> (2) a second letter from Dr. Haynes dated November 23, 2005;

> (3) a letter from Dr. Stanislaus Gunadi, plaintiff's treating psychiatrist, referencing a September 19, 2005 evaluation;

> (4) a letter from Dean Downs, the president of plaintiff's employer, AMC.  (AR 341).

Plaintiff's appeal stated that based on the letters, there were no grounds for defendant's denial of benefits (AR 342).

On January 16, 2006, defendant responded to plaintiff indicating that it would take Dr. Haynes' and Dr. Gunadi's letters into consideration, but further requested actual medical records from plaintiff's physicians (AR 322-23).  Plaintiff's counsel forwarded additional documentation to defendant, including a Forest View Hospital January 31, 2006 psychiatric admission evaluation by Dr. Gunadi, recommending that plaintiff not work 70-80 hours a week as it would most likely precipitate a relapse (AR 312-17).

In February 2006, defendant notified plaintiff that it was sending plaintiff's file for an independent external review with a peer physician (AR 297).  Defendant sent plaintiff's file to Dr. Thomas Gratzer, a board-certified forensic psychiatrist with a speciality in general addiction, who opined based on his file review that plaintiff could return to work at 70-80 hours a week as of June 22, 2005 (AR 192-99, 278-79).  Dr. Gratzer's stated rationale for his conclusion included that plaintiff showed no evidence of psychiatric impairments, he had been abstinent for one year, and that

7

the risk of relapse was separate from a psychiatric impairment (AR 196-99).  Dr. Gratzer found no particular risks associated with increasing Dr. Kufner's hours to 70-80 hours a week (*id.*).  On March 13, 2006, defendant notified plaintiff that his appeal was denied in a four-page letter detailing its reasoning (AR 277-280).  In upholding its denial of partial disability benefits, defendant relied primarily on Dr. Gratzer's assessment (AR 278-79).  Defendant stated that based on the information received from Dr. Gratzer, plaintiff "was able to perform all the main duties of his regular occupation as an anesthesiologist on a full-time basis, up to 80 hours per week, as of June 22, 2005" (AR 279).  Defendant advised plaintiff that he was entitled to submit another appeal if he so chose (AR 280).

In a letter dated September 6, 2006, plaintiff's counsel requested a review of the March 13, 2006 denial (AR 119).  Counsel objected to the review by Dr. Gratzer, stating that it was neither independent nor performed by a peer, as set forth in an attached May 31, 2006 letter from Dr. Haynes, a qualified addiction specialist and plaintiff's treating physician, and Dr. Thomas Kane, another qualified addiction specialist (*Id.*).  Counsel asserted that Dr. Gratzer did not have the credentials to provide the opinions given (*Id.*).  Counsel further objected to the denial from a factual standpoint, which counsel asserted was totally without basis as set forth in the attached letters from Dr. Haynes and Dr. Kane and the further clarification of Dr. Gunadi, who unlike Dr. Gratzer had personally seen plaintiff (*Id.*).  Counsel's letter stated that plaintiff would expect a written explanation of defendant's decision within 45 days, at which point, plaintiff would have exhausted his administrative remedies (AR 120).

On October 17, 2006, defendant notified plaintiff's counsel that it had referred plaintiff's claim file for review by another external consultant, Dr. Marcus Goldman, a board-certified

psychiatrist with a subspecialty in addiction psychiatry (AR 102).  Defendant also provided a copy

of the curriculum vitae of Dr. Gratzer, which defendant asserted was evidence that Dr. Gratzer was

qualified to review plaintiff's claim (AR 102, 104-106).  Defendant stated that Dr. Goldman's

opinions were similar to those of Dr. Gratzer in that Dr. Goldman failed to find any evidence to

support continued work restrictions on plaintiff after June 22, 2005 (AR 102).  Defendant provided

a copy of Dr. Goldman's report for response by plaintiff's physicians and gave plaintiff 21 days, by

November 7, 2006, to respond (*id.*).  Defendant also requested further information regarding

accommodations currently being made for plaintiff while working approximately 50 hours a week

(*id.*).  Defendant noted that it was exercising its right to a 45-day extension to process plaintiff's

appeal (AR 103).

Plaintiff's counsel responded in a five-page letter dated November 7, 2006, setting forth both

procedural and substantive objections to plaintiff's claim review (AR 7-11).  With regard to

accommodations being made for plaintiff, counsel attached letters from (1) Dr. Donald Weston, a

partner in AMC regarding oversight of plaintiff, his medical care plan, and controlled medication

restrictions; (2) Dr. J. Robert VanTimmeren, who handles scheduling of Butterworth Hospital's

operating rooms and accommodations related thereto for plaintiff; and (3) Dr. William G. Swagman

of AMC regarding accommodations for plaintiff to work 50 hours per week (AR 8, 12-16).

Plaintiff's counsel's November 7, 2006 letter also detailed substantive challenges to

defendant's decisions, including challenges to Dr. Goldman's credentials and opinions (AR 8-9) and

Dr. Gratzer's qualifications and opinions (AR 9-10).  The letter details investigations into the

background and employment of Dr. Goldman and Dr. Gratzer (AR 8-10).  Counsel attached

additional letters and documentation from plaintiff's physicians in response to the opinions of Dr. Goldman:

1.  a November 1, 2006 letter from Dr. Haynes, refuting point by point the allegedly unsubstantiated claims of Dr. Goldman, as well as an article referenced by Dr. Haynes, entitled, "Treatment Approaches for Drug Addiction," dated August 2006 from the National Institution on Drug Abuse, National Institutes of Health;

2.  an October 26, 2006 letter from Dr. Downs, further addressing plaintiff's restriction on dispensing drugs and his 50-hour work week restriction;

3.  a letter from Dr. Kane also addressing the allegedly unsubstantiated opinions of Dr. Goldman

(AR 11, 17-37).

On November 28, 2006, defendant notified plaintiff's counsel that plaintiff's appeal was again denied (AR 1).  In a detailed letter, defendant explained its reasons for the denial of partial disability benefits (AR 1-3).  In short, defendant found no evidence to support that plaintiff was unable to work full-time in his own occupation:

While there may be a plan in place that he and his current employer feels works best for him, medically we fail to find evidence supporting [that] his condition would actually preclude him from working the normal work schedule just prior to his claim for benefits.

(AR 2).  Defendant noted that two professional opinions further supported defendant's finding that there is nothing to preclude plaintiff from working the normal work schedule just prior to his claim for benefits (*id.*).  The letter stated that plaintiff's claim had been reviewed at least three times, by defendant's Benefit Specialist, its Appeals Specialist, and its Appeal Council.  It stated further that since the Appeals Council was the final stage in the appeals process, there was no further review

10

available under the policy, although plaintiff could pursue litigation (AR 3).  Plaintiff thereafter filed this action.

## V.  Analysis

The key dispute in this case is whether plaintiff is able to work 70-80 hours a week, which the parties do not dispute constitutes "full-time" work for plaintiff.  The question presented is essentially whether defendant abused its discretion in crediting the opinions of its peer review physicians over the opinions of plaintiff's treating physicians to conclude that plaintiff was able to perform the main duties of his regular occupation on a full-time basis.  Considering the extensive evidence presented by plaintiff to support his claim for disability, and case-specific factors (the nature of the evidence, conflict of interest, and public health and safety), the Court finds that defendant's denial of benefits was an abuse of discretion.

### A.  Plan Provisions

At issue are the Plan's provisions for partial disability benefits.  The Plan states that a Partial Disability Monthly Benefit will be paid after the Elimination Period if the Insured Employee:

1. is Disabled;
2. is engaged in Partial Disability Employment;
3. is earning at least 20% of Pre-Disability Income when Partial Disability Employment begins;
4. is under the regular care of a Physician; and
5. at his or her own expense, submits proof of continued Partial Disability, Physician's care and reduced earnings to the Company upon request.

(Policy 22.)

The Plan defines "Partial Disability" in relevant part[2] as follows:

---

[2] Partial disability is defined in terms of either the "Elimination Period and Own Occupation Period" or after the "Own Occupation" period (AR 22).  In this case, only the former is at issue.

11

1. During the Elimination Period and Own Occupation Period, it means that due to an Injury or Sickness the Insured Employee:
    (a) is unable to perform one or more of the main duties of his or her regular occupation; or is unable to perform such duties full-time; and
    (b) is engaged in Partial Disability Employment.

(Policy 22.)

The policy further provides:

PARTIAL DISABILITY EMPLOYMENT means the Insured Employee is working at his or her own or any other occupation; but because of a Partial Disability:
    1. the Insured Employee's hours or production is reduced;
    2. one or more main duties of the job are reassigned; or
    3. the Insured Employee is working in a lower paid occupation.
His or her current earnings must be at least 20% of Predisability income, and may not exceed the percentage specified in the Partial Disability Benefit section.

(Policy 8.)

The Plan defines Full-Time as:

the average number of hours the Insured Employee was regularly scheduled to work, at his or her regular occupation, during the [week] just prior to:
    (1) the date the Elimination Period begins; or
    (2) the date an approved leave of absence begins, if the Elimination Period begins while the Insured Employee is continuing coverage during a leave of absence.

(Policy 22.)

## B.  Evidence

On initial review, this ERISA appeal appears to present a benefits determination based merely on a choice between contrary medical opinions offered by the parties.  On closer review, however, the Court finds that the parties' opposing evidence does not warrant equal weight. Although plaintiff provided medical records and diagnoses of his treating physicians to establish his eligibility for LTD benefits, defendant rejected that evidence in favor of the professional opinions it secured, which did not involve medical treatment or diagnosis of plaintiff, but were simply "peer

reviews" of plaintiff's medical records and evidence. Given the disparity in the nature and substance of the medical evidence, the evidence offered by defendant is not entitled to equal weight in the determination of eligibility for benefits. Accordingly, this case does not present a close question from the standpoint of the medical evidence. Plaintiff has presented extensive and persuasive medical evidence supporting his claim for LTD benefits while defendant's evidence falls far short of providing a comparable basis for defendant's denial of benefits.

The evidence provided by plaintiff established that plaintiff was unable to work full-time due to his addiction and the risk of a relapse. An October 20, 2004 letter from Dr. Haynes to defendant stated that plaintiff was "permitted to work a maximum 40-hour week and must avoid on-call duty" (AR 511). It further stated that plaintiff "was discharged with a 2-year Continuing Care Contract, a detailed treatment plan designed to provide care required to maintain abstinence, foster recovery, and avoid relapse (*id.*). In an opinion dated July 22, 2005, Dr. Haynes stated that plaintiff had been in continuous abstinence-based recovery for more than one year, but he remained at risk of relapse:

> Ronald Kufner, MD continues under my care for his disease of opioid dependence and he has now been in continuous abstinence-based recovery for over one year. However, his work as an anesthesiologist continues to put him at risk for relapse. For this reason he is being monitored by this office and also by the Michigan Health Professional Recovery Program. That monitoring will be continuing for at least two years. Dr. Kufner's allowed hours of work have recently been increased from 40 to 50 hours per week, but this does not constitute full time work for an anesthesiologist. In general, a full time workload for an anesthesiologist is 80 hours per week. Therefore and on this basis alone, he should be considered to be at 5/8 functioning or 3/8 disability.

(AR 352).

The July 22, 2005 opinion from Dr. Haynes provides detailed reasoning for his opinion that plaintiff is unable to work full-time. While Dr. Haynes stated that plaintiff's hours had recently been increased from 40 to 50 hours per week, he concluded that plaintiff remained under disability

13

because of his risk of relapse; thus, he was working at 5/8 of his expected full-time work (AR 352). During the course of the claim proceedings, plaintiff submitted numerous additional medical records and further opinions of Dr. Haynes and Dr. Gunadi, plaintiff's treating psychiatrist, to support his LTD claim.  On November 23, 2005, an opinion from Dr. Haynes stated that plaintiff remained under significant restrictions regarding his main duties during his active work as an anesthesiologist and that the restrictions were necessitated by the need to reduce the risk of relapse (AR 353).  Dr. Haynes stated:

> The specific restrictions that have been placed on Dr. Kufner are; [sic]  1) that he should work no more than 50 hours per week, and 2) that he cannot possess, handle, dispense or administer controlled substances including opioid analgesics. . . .

(*id.*)  An opinion from Dr. Gunadi stated that he evaluated plaintiff on September 19, 2005 and that it was his opinion that plaintiff "can not [sic] and should not return to his previous level of employment (AR 354). "  Dr. Gunadi stated further that plaintiff's work hours must be reduced to eliminate the risk of relapse as the stressful work environment was a major factor contributing to plaintiff's current problems (*id.*).

Plaintiff also provided a November 23, 2005 opinion from Dr. Downs, president of AMC (AR 356), detailing the standard work hours and requirements for an AMC anesthesiologist.  The opinion stated that plaintiff was producing at only about 57 percent of his former level and that his work activities were severely limited (impliedly because of his addiction issues).  On January 31, 2006, Dr. Gunadi completed a psychiatric evaluation pertaining to plaintiff's opioid dependence and recommending that plaintiff not return to working the 70-80 hours a week that he worked previously as it would most likely precipitate a relapse and because plaintiff needed to commit time to continued substance abuse treatment to maintain his sobriety (AR 317).

14

Although defendant initially approved plaintiff's claim for LTD benefits by a letter dated November 10, 2004, even after plaintiff's return to work (AR 494), defendant subsequently notified plaintiff on July 11, 2005 that his LTD claim was denied as of June 22, 2005 based on defendant's review of the records (AR 417).  Defendant's initial denial was based on a review of medical records and opinions submitted by plaintiff.  Defendant subsequently secured opinions from Dr. Gratzer and Dr. Goldman, which defendant ultimately relied on in denying plaintiff's claim for LTD.  According to defendant, Dr. Gratzer is "board-certified with a speciality in general addiction" (Def's. Br. 13). Dr. Gratzer provided an opinion based on his independent external review of plaintiff's file (AR 192-199).  Dr. Gratzer concluded that plaintiff could return to work 70 to 80 hours a week as of June 22, 2005 and, although plaintiff "may choose not to do so because of personal reasons," there was no evidence of psychiatric impairments that would preclude his increase in hours (AR 198).  Dr. Gratzer provided a three-paragraph rationale for his conclusions, indicating among other things, that the risk of relapse remained a lifelong issue for plaintiff; that he showed no evidence of psychiatric impairments; and that he had been abstinent for one year, which was separate from a psychiatric impairment (*id.*).

Following plaintiff's claim appeal on September 6, 2006, in which plaintiff questioned the qualifications of Dr. Gratzer, defendant secured a "Peer Review Report" from Dr. Goldman, again based on a review of plaintiff's file (AR 107-09).  According to defendant, Dr. Goldman is a board-certified psychiatrist with a subspecialty in addiction psychiatry (Def's. Br. 14-15).  Similarly to Dr. Gratzer, Dr. Goldman concluded that plaintiff had no functional impairment as of June 22, 2005 (AR 108).  Dr. Goldman stated that his review of the data revealed that plaintiff was "handling the stress of work, albeit at reduced hours as well as stressors at home, without relapse.  While there remains

15

a risk of relapse in any individual with such a history, these data do not signal any inevitable or impending relapse with an increase in hours. . . . He functions at work and while being exposed to addictive substances, chose not to use them.  It is suggested that he could have returned to his premorbid work schedule. . . ." (AR 108).  Dr. Goldman concluded that the data do not support psychiatric functional incapacity or other basis for plaintiff's assertion that he is unable to perform the demands of his own occupation greater than 40-50 hours a week (AR 109).

During the course of his appeals, in response to the opinions of Dr. Gratzer and Dr. Goldman, plaintiff submitted additional medical records and opinions to thoroughly support his disability claim (see AR 119-137 in response to Dr Gratzer's opinion, and AR 7-47 in response to Dr. Goldman's opinion).  In particular, plaintiff submitted letters from Dr. Kane, who is certified in adult psychiatry and addiction medicine, who stated in very detailed terms that he agreed with the opinions of plaintiff's treating physicians and disagreed with the opinions of Dr. Gratzer and Dr. Goldman (AR 33-37, 129-30).  Plaintiff also submitted extensive documentation calling into question the credentials of Dr. Gratzer and Dr. Goldman and their qualifications to render opinions on plaintiff's disability.[3]

## C.  Discussion

The initial question in this case is whether defendant's denial of plaintiff's LTD claim should be upheld on the basis of the opinions of Dr. Gratzer and Dr. Goldman despite the extensive medical opinions, records, and other evidence submitted by plaintiff in support of his claim.  The Supreme Court has held that a plan administrator need not "automatically [] accord special weight to the opinions of a claimant's physician."  *See Nord*, 538 U.S. at 834.  Nor do plan administrators have

---

[3] The Court now has before it an administrative record in excess of 700 pages in this case.

"a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* Nonetheless, "[p]lan administrators ... may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* And while there is "'nothing inherently objectionable about a file review by a qualified physician in the context of a benefits determination,' it is a factor to be considered in reviewing the propriety of an administrator's decision regarding benefits." *Evans,* 434 F.3d at 877 (citation omitted); *see also Glenn,* 461 F.3d at 671. Ultimately, a district court's review of a denial of ERISA benefits under the arbitrary and capricious standard properly requires a review of the quality and quantity of the medical evidence and the opinions on both sides of the issue. *Evans,* 434 F.3d at 876. In this case, plaintiff has presented extensive and persuasive medical evidence supporting his claim for LTD benefits, which the Court finds far outweighs the evidence relied on by defendant both in quantity and quality. Moreover, this is a case in which the conflict of interest factor in ERISA benefits determinations must be weighed substantially in favor of plaintiff. Defendant serves as the plan administrator to determine eligibility for benefits and is also the payor of benefits, which presents an apparent conflict of interest. *Glenn*, 128 S. Ct. at 2349-50. The conflict of interest created by a plan administrator's dual roles of interpretation of the plan and payment of benefits is a factor to be considered in reviewing a discretionary benefit determination. *Id.* at 2350.

In this case, there is no dispute regarding the straightforward provisions of the Plan, which provide for partial disability benefits if the claimant is "unable to perform one or more of the main duties of his or her regular occupation; or is unable to perform such duties full-time." Defendant initially approved plaintiff's claim for LTD benefits; and only later denied plaintiff's claim. Defendant provides no persuasive basis for denying benefits to plaintiff based on plaintiff's medical

records or the Plan provisions.  Defendant provides no evidence impugning the medical opinions of plaintiff's treating physicians.  Defendant simply offers opinions from other experts who opine, based on their review of plaintiff's medical records, that plaintiff is able to work 70-80 hours a week despite his history of addiction and risk of relapse.  Although the conflict of interest factor may not be worthy of special weight in all cases, in this case, the Court is persuaded that the course of the benefits consideration by defendant reflects defendant's tenacious adherence to its position denying LTD benefits despite competent and overwhelming evidence supporting a contrary decision.  The Court finds these circumstances troublesome.

The AMC Plan entitled plaintiff to LTD benefits if he was unable to work his normal full-time week of 70-80 hours.  Following his treatment for his narcotics addiction, plaintiff was medically restricted to working only 40-50 hours a week because of the risk of relapse.  Despite the medical restriction imposed by plaintiff's physicians, defendant would have plaintiff work to the point of relapsing into narcotics addiction, and only then, would plaintiff be considered for LTD benefits.

In effect, defendant's denial of LTD benefits is based on the rather amorphous determination that plaintiff can and should work 70-80 hours a week as a hospital anesthesiologist unless and until he has an actual relapse of his narcotics addiction.  This position is untenable given the serious risk this poses to public health and safety, which the Court considers as an additional factor weighing against defendant's benefits determination.  Defendant essentially engaged in a form of "benefits Russian roulette" with plaintiff's career and his patients' lives at risk.  Given that anesthesiology is an enormously complex and crucial, if not perilous, component of the surgical process, necessarily entrusted to the judgment and oversight of the health care system rather than the individual patient,

defendant's position with regard to disability benefits is tantamount to a breach of the public trust. Defendant would force plaintiff to work to the brink of failure to justify disability benefits, thereby imposing an unacceptable risk on patients, hospitals and the public generally—a risk of error that neither plaintiff nor the public should bear. This is particularly so given an insurer-administrator's obligation to discharge its duties under ERISA solely in the interests of the participants and beneficiaries:

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon a plan administrator, namely, that the administrator "discharge [its] duties" in respect to discretionary claims processing "solely in the interests of the participants and beneficiaries" of the plan, § 1104(a)(1); it simultaneously underscores the particular importance of accurate claims processing by insisting that administrators "provide a 'full and fair review' of claim denials," *Firestone,* 489 U.S. at 113, 109 S.Ct. 948 (quoting § 1133(2)); and it supplements marketplace and regulatory controls with judicial review of individual claim denials, *see* § 1132(a)(1)(B).

*Glenn,* 128 S.Ct. at 2350.

That defendant was willing to go to excessive lengths to deny benefits on such questionable reasoning persuades the Court that defendant was motivated by its fundamental financial interest in denying benefits. These circumstances warrant additional weight to the conflict of interest factor in favor of plaintiff, particularly absent any evidence that neutralizes the conflict of interest. *See id.* at 2351 (the conflict of interest should prove less important where the administrator takes active steps to reduce potential bias and to promote accuracy, e.g., walling off claims administrators from those involved in firm finances).

Defendant ignored plaintiff's extensive medical evidence, treatment records, and the opinions of plaintiff's physicians. Defendant instead secured and relied on conclusory "peer review" opinions from doctors retained by defendant. As the plan administrator, defendant had a clear

19

incentive to contract with physicians who were inclined to find in its favor that plaintiff was not entitled to continued LTD benefits. *See Calvert,* 409 F.3d at 292. It is also noteworthy that because of plaintiff's professional work history/income, his claim involved payment of the maximum benefits under the Plan (*see* AR 268, 486). "Under such facts 'the potential for self-interested decision-making is evident.'" *Calvert,* 409 F.3d at 292 (quoting *Univ. Hosps. of Cleveland v. Emerson Elec. Co.,* 202 F.3d 839, 846 n.4 (6th Cir. 2000)).

The Court is well-acclimated to review standards and is cognizant of the deferential standard applicable in ERISA benefits analysis. Even giving due regard to the deferential standard of review the Court concludes that the above factors, coupled with the extensive evidence in support of plaintiff's claim, warrant reversal of defendant's denial of LTD benefits. It cannot be said that defendant's decision resulted from a "'deliberate principled reasoning process,'" or was "'supported by substantial evidence.'" *Evans,* 434 F.3d at 876 (citation omitted).

## VI. Conclusion

In short, this case lacks a credible basis for denying benefits. Weighing the record and the factors involved in the benefits determination, the Court concludes that defendant abused its discretion in disregarding plaintiff's evidence and opinions in favor of the "independent" opinions secured by defendant, from physicians who are less qualified on addiction issues and less familiar with plaintiff's medical treatment.

Defendant's decision to deny LTD benefits to plaintiff was arbitrary and capricious. Accordingly, plaintiff's claim for relief under 29 U.S.C. § 1132(a)(1)(B) and 28 U.S.C. § 2201 concerning long-term disability benefits under the Employment Retirement Income Security Act of 1974 is granted.

A Judgment consistent with this Opinion will issue.


DATED: January 16, 2009              /s/ Janet T. Neff _____
                                    JANET T. NEFF
                                    United States District Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RONALD KUFNER, M.D.,

        Plaintiff,                    Case No. 1:06-cv-910

v.                                       HON. JANET T. NEFF

JEFFERSON PILOT FINANCIAL
INSURANCE COMPANY,

        Defendant.
_____/

## JUDGMENT

In accordance with the Opinion entered this date:

Plaintiff's claim for relief under 29 U.S.C. § 1132(a)(1)(B) and 28 U.S.C. § 2201 concerning

long-term disability benefits under the Employment Retirement Income Security Act of 1974 is

granted.  In accordance with the relief requested in Plaintiff's First Amended Complaint:

**IT IS HEREBY DECLARED AND ADJUDGED** that:

1.     Plaintiff is entitled to disability benefits in the proper amounts as set forth in the Plan in effect at the time benefits became payable; and

2.     Defendant shall pay Plaintiff forthwith the full amount of disability benefits due him and shall continue such payments for the period set forth in the Plan, including interest on all unpaid benefits.

**IT IS SO ORDERED.**

DATED: January 16, 2009            /s/ Janet T. Neff_____
                                    JANET T. NEFF
                                    United States District Judge